IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

BONNIE J. HOLLIMAN,                     )
                                        )       Case No. 08-50181
                    Plaintiff,          )
                                        )       Hon. P. Michael Mahoney
            v.                          )       U.S. Magistrate Judge
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )


**MEMORANDUM OPINION AND ORDER**


**I.      Introduction**

        Bonnie J. Holliman ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Disability Insurance

Benefits ("DIB"), under Title II of the Social Security Act, and Supplemental Security

Income ("SSI") benefits, under Title XVI of the Social Security Act. *See* 42 U.S.C. §

405(g). This matter is before the Magistrate Judge pursuant to the consent of both parties,

filed on August 6, 2009. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.


**II.     Administrative Proceedings**

        On January 21, 2005, Claimant applied for DIB and SSI alleging her disability

onset date as June 15, 2004. (Tr. 110.) Claimant's application was initially denied on

May 27, 2005, and then denied a second time upon reconsideration on September 23,

2005. (Tr. 99-101, 105-08.) Claimant then filed a timely request for a hearing before an

Administrative Law Judge ("ALJ"). The hearing took place on December 11, 2007, via

1

video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ

Cynthia Bretthauer. The Claimant appeared *pro se* before the ALJ, but indicated that an

attorney agreed to represent her if the hearing could be postponed. Relying on this

information, the ALJ agreed to postpone the hearing. (Tr. 55-61.)

Claimant's attorney ultimately declined to take her case. (Tr. 64.) Claimant then

sought legal representation from Prairie State Legal Clinic (PSLC). (Tr. 21-22, 65.)

PSLC also declined to represent Claimant, because Claimant did not have supporting

medical records and she "has a history of heavy drinking." (Tr. 21.) According to the

declination letter, dated March 10, 2008, Claimant told PSLC that she had not been

treated by a doctor for a year or more, and before that time (2007 and prior), she had only

been treated "sporadically." (Tr. 21.) PSLC went on to communicate the importance of

developing a current medical record, and recommended that Claimant contact

Winnebago County Lawyer Referral to obtain counsel. (Tr. 21.) There is no evidence on

record that Claimant made an effort to contact any other representative.

The rescheduled hearing was held on March 18, 2008. Claimant again appeared

without an attorney present. (Tr. 62-86.) The ALJ reminded Claimant that the "last time

[Claimant was in court] was in 2007, and [Claimant] was well aware of [her] rights[,]

[a]nd [Claimant] had the list of attorneys and attorney referral agencies." (Tr. 64.) The

ALJ then asked Claimant if she was ready to proceed without an attorney to represent

her. (Tr. 65.)  Claimant replied, "I guess so, ma'am. Yes, ma'am." (Tr. 65.) During the

hearing, the ALJ heard testimony from both the Claimant and vocational expert ("VE")

James J. Radke. (Tr. 62-86.)

On April 23, 2008, the ALJ found Claimant was not disabled and denied Claimant's applications for DIB and SSI. (Tr. 9-20.) On June 3, 2008, Claimant filed a Request for Review with the Social Security Administration's Office of Hearing and Appeals. (Tr. 7.) The Appeals Council denied Claimant's Request for Review on July 15, 2008. (Tr. 4-6.) As a result of the denial, the ALJ's decision is considered the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in Federal District Court seeking judicial review under 42. U.S.C. §§ 405(g), 1383(c)(3).

### III.    __Background__

Claimant was born on September 25, 1956, making her fifty-one years old at the time of the hearing. (Tr. 142.) She weighed approximately 190 pounds, and was five feet and two inches tall. (Tr. 178.) Claimant was not married and lived alone in an apartment in Rockford, Illinois. (Tr. 67-68.) Claimant speaks English fluently, and has completed her high school education. (Tr. 69.)

Claimant testified that her typical daily schedule consisted of waking up in the morning to attend rehabilitation treatment at Rosecrance, a substance abuse treatment facility in Rockford. (Tr. 85.) Since the Claimant does not drive, she rode the bus in order to get to the facility. Claimant further testified that she walked one city block to get to the bus stop from her apartment. (Tr. 85-86.) She normally received treatment at Rosecrance for approximately three hours. Afterwards, she walked to the nearest bus stop, and took

the bus back home. (Tr. 85.) According to her testimony, once in her apartment, she often sat down, tried to clean, and made something to eat. (Tr. 85.) After eating, Claimant usually watched television until she went to bed. (Tr. 85.)

Claimant further stated that she generally did her own dusting and vacuuming. She washed her own dishes and cleaned her clothes by hand. She also testified that she was able to do her own grocery shopping. (Tr. 86.) She attended church two or three times a week, and maintained social relationships with her family and friends. She testified that she generally got along with other people. (Tr. 86a.) Occasionally, friends would drive her to run errands, or she rode the bus when she could afford it. (Tr. 69.) Around the time of the hearing, Claimant's brother and sister drove her to Iowa City, Iowa, in order to visit another sister in the hospital. (Tr. 86a.) Otherwise, Claimant tended to stay within the city limits. (Tr. 86a.)

Claimant regularly received $450 for her rent and $19 in additional assistance under Section 8. (Tr. 68.) *See* 24 C.F.R. § 5.601. She also was receiving a Link Card for the amount of $162 to pay for groceries. (Tr. 68.)

Although she was unemployed at the time of the hearing, Claimant has held several occupations over the past thirty years. (Tr. 70.) Most notably, she was employed as a cook, dietary aide, homemaker, machine operator, and factory assembler. (Tr. 159.) Claimant testified that she worked most recently as a babysitter for her grandchildren from 2005 to 2007. (Tr. 70.) She has not been employed since that time. (Tr. 70.) Claimant has alleged that she can no longer work due to asthma, high blood pressure, emphysema, depression, shortness of breath, stroke, and heart attack. (Tr. 142-45, 178.)

4

## IV.    Medical Evidence

On July 13, 1994, Claimant was brought to Rockford Memorial Hospital ("RMH") complaining of shortness of breath. (Tr. 354.) Claimant stated that she was taking medications for asthma, but could not relate what medications she was taking. (Tr. 354.)  Dr. Dennis T. Uehara, M.D., diagnosed the Claimant with acute alcohol intoxication, and she was discharged. (Tr. 354.)

On March 24, 1997, Claimant was brought to RMH with chest pain. (Tr. 346.) Dr. Uehara noted that she had a "similar episode in 1992 which she thinks may have been a small 'heart attack.'" (Tr. 346.) At the time, Claimant stated that she had not experienced any chest pains since 1992. (Tr. 346.) Dr. Uehara discharged Claimant with a prescription for Toradol[1]. (Tr. 346.)

On January 17, 1998, Claimant returned to RMH with pain in her right shoulder and neck. (Tr. 340.) Dr. Thomas S. Pannke, M.D., examined Claimant and diagnosed her with acute right shoulder strain. (Tr. 340.) She was given Toradol and Norflex[2] while at the hospital. (Tr. 340.) Dr. Pannke discharged Claimant and recommended that Claimant not work with her right hand for three days. (Tr. 340.)

---

[1] Toradol is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. Drugs.com, http://www.drugs.com/toradol.html.

[2] Norflex is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain. Drugs.com, http://www.drugs.com/mtm/norflex.html.

On April 16, 1998, Claimant came to RMH complaining of hypertensive headaches, lightheadedness, and dizziness. (Tr. 337.) Dr. Robert W. Schwaner, M.D., noted that the symptoms started when Claimant ran out of her Procardia XL[3] prescription about three days prior. (Tr. 337.) Dr. Schwaner diagnosed Claimant with hypertension, recommended that she not work for the "next couple of days," and renewed Claimant's prescription for Procardia XL. (Tr. 337.)

On May 14, 1998, Claimant was treated at RMH after sustaining a fall. (Tr. 330.) Claimant complained of pain in her neck, buttocks, and a headache. (Tr. 330.) Dr. Craig H. Brown, M.D., diagnosed the Claimant with a severe headache ("acute cephalgia"), acute coccyx injury, and acute lumbosacral strain. (Tr. 330.) When examining Claimant's spine, Dr. Brown noted that there was "[f]ocal mild degenerative disc disease at L4-5, but [it was] advanced for [Claimant's] age." (Tr. 332.) Dr. Brown discharged Claimant after giving her Toradol. (Tr. 332.)

Claimant returned to RMH on May 20, 1998, complaining of more back pain related to her fall on May 13, 1998. (Tr. 326.) Dr. Brian N. Aldred, M.D., diagnosed Claimant with acute muscular back pain. (Tr. 326.) Claimant requested a "pain shot," and was given a shot of Toradol. (Tr. 326.). Dr. Aldred instructed Claimant to follow up with her doctor and to rest. Claimant was discharged in "good condition." (Tr. 326.)

On June 5, 1998, Claimant entered RMH for anxiety. She complained of a mild headache and was worried about her blood pressure. (Tr. 323.)  Again, as on April 16, 1998, Claimant stated that she ran out of her Procardia XL medication approximately three days prior. (Tr. 323.) Dr. Pannke diagnosed Claimant with acute psychological

_____

[3] Procardia XL is in a group of drugs called calcium channel blockers. It works by relaxing the muscles of your heart and blood vessels. It is used to treat hypertension (high blood pressure) and angina (chest pain). Drugs.com, http://www.drugs.com/mtm/procardia-xl.html.

stress, elevated blood pressure, and noted Claimant's "history of hypertension." (Tr. 323.) Claimant was given a single dose of Procardia XL and a few Xanax[4]. She was asked to follow up with Dr. Ramchandani to recheck her blood pressure. (Tr. 323.) She was also given another prescription for Procardia XL. (Tr. 323.)

Five years later, on June 23, 2003, Claimant entered RMH complaining of a severe headache. (Tr. 315.) Dr. Jane L. Kotecki, M.D., noted that Claimant has had a history of "hypertension, medical noncompliance, and alcohol abuse." (Tr. 315.) Claimant's physical examination revealed that the Claimant was "grossly intoxicated" at the time of her admittance. (Tr. 315.) Dr. Kotecki diagnosed the Claimant with acute hypertensive urgency, acute alcohol intoxication, and "chronic and continuous" alcohol abuse. (Tr. 315.) Claimant was given Lopressor[5], Clonidine[6], and Dilaudid[7]. Claimant was discharged and ordered to see her doctor at Crusader Clinic ("Crusader") in one to two days for a checkup. (Tr. 315.)

On March 11, 2004, Claimant entered Crusader with an asthmatic attack and

---

[4] Xanax is in a group of drugs called benzodiazepines. It affects chemicals in the brain that may become unbalanced and cause anxiety. Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. Drugs.com, http://www.drugs.com/xanax.html.
[5] Lopressor ("hydrochlorothiazide and metoprolol") is a thiazide diuretic (water pill) that helps prevent your body from absorbing too much salt, which can cause fluid retention. Metoprolol is a beta-blocker. Beta-blockers affect the heart and circulation. Lopressor is used to treat hypertension. Drugs.com, http://www.drugs.com/mtm/lopressor-hct.html.
[6] Clonidine lowers blood pressure by decreasing the levels of certain chemicals in your blood. This allows your blood vessels to relax and your heart to beat more slowly and easily. Clonidine is used to treat hypertension. Drugs.com, http://www.drugs.com/clonidine.html
[7] Dilaudid is prescribed for the relief of moderate to severe pain. It works by binding to certain receptors in the brain and nervous system to reduce pain. Drugs.com, http://www.drugs.com/dilaudid.html.

signs of an upper respiratory tract infection. (Tr. 225.) Dr. Adekola Ashaye, M.D., gave

Claimant nebulizer treatment. (Tr. 225.) After the treatment, Claimant showed signs of

improvement. (Tr. 225.) Dr. Ashaye then referred Claimant to the emergency room

("ER") in order to manage her blood pressure. (Tr. 225.)

Claimant was then immediately taken to SwedishAmerican Hospital ("SAH").

(Tr. 206.) Claimant stated that she had not been taking her medication for approximately

two years because she could not afford it. (Tr. 206.) Claimant also stated that she had

been coughing up blood for a period of two months. (Tr. 206.) Dr. Michael P. Lehmann,

M.D., prescribed Procardia XL, Albuterol[8], and Atrovent[9]. (Tr. 206.) Dr. Lehmann

diagnosed Claimant with hypertensive urgency and hemoptysis ("coughing blood"). (Tr.

206.) Dr. Lehmann agreed to discharge Claimant home, but advised her to get her blood

pressure checked the next day at Crusader. (Tr. 206.)

On March 20, 2004, Claimant returned to Crusader with hypertension. (Tr. 224.)

Dr. Ashaye noted that Claimant "[h]as been going up and down through [the] ER and

[Crusader] and has not been collecting her medications." (Tr. 224.) Dr. Ashaye

continued: "[Claimant] will be seen in the ER and given prescriptions[,] but until the last

nine days since I [have seen] her, she has not picked up any of her prescriptions. She says

she has no money." (Tr. 224.) Dr. Ashaye contacted the pharmacy and managed to get

Claimant into a program to help her pay for her prescriptions. (Tr. 224.) Under the

program, Claimant was able to receive her monthly Atacand prescription for five dollars.

(Tr. 224.)

---

[8] Albuterol is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs.
Albuterol is used to treat or prevent bronchospasm in people with reversible obstructive airway disease.
Drugs.com, http://www.drugs.com/albuterol.html.

[9] Atrovent is used to prevent bronchospasm, or narrowing airways in the lungs, in people with bronchitis,
emphysema, or chronic obstructive pulmonary disease. Drugs.com, http://www.drugs.com/atrovent.html.

On April 8, 2004, Claimant returned to Crusader with hypertension. (Tr. 222.) Dr. Ashaye noted that Claimant was taking her medication, and increased her Toprol XL[10] prescription. (Tr. 222.) Claimant was also given a prescription for a Combivent[11] inhaler, and Lasix[12]. (Tr. 222.)

On April 22, 2004, Claimant returned to Crusader. Dr. Ashaye stated that he has "had problems controlling [Claimant's] blood pressure, primarily because [Claimant] cannot afford the medications." (Tr. 221.) He continued: "I got [Claimant] into a free drug program . . . She did not take the Toprol as directed . . . I have explained to her that the problem [with] her blood pressure control has to do with [her not taking the] medications." (Tr. 221.)

On April 29, 2004, Claimant returned to Crusader to see Dr. Ashaye. (Tr. 220.) In her report, Dr. Ashye stated: "We have helped [Claimant] with her medications from the drug assistance program . . . Toprol XL at a maximum dose and Atacand[13] are not helping her blood pressure. She is supposed to be taking Lasix. She has not taken it." (Tr. 220.) After Claimant declined to be taken to the ER, Dr. Ashye explained the dangers inherent in not complying with her medications. (Tr. 220.)

---

[10] Toprol-XL is a beta-blocker. Beta-blockers affect the heart and circulation. Toprol-XL is used to treat angina (chest pain) and hypertension. It is also used to treat or prevent heart attack. Drugs.com, http://www.drugs.com/toprol.html.

[11] Combivent contains a combination of albuterol and ipratropium. Albuterol and ipratropium are bronchodilators that relax muscles in the airways and increase air flow to the lungs. Combivent is used to prevent bronchospasm in people with chronic obstructive pulmonary disease who are also using other medicines to control their condition. Drugs.com, http://www.drugs.com/combivent.html.

[12] Lasix is a loop diuretic that prevents your body from absorbing too much salt, allowing the salt to instead be passed in your urine. This medication is often used to treat hypertension. Drugs.com, http://www.drugs.com/lasix.html.

[13] Atacand is in a group of drugs called angiotensin II receptor antagonists. It keeps blood vessels from narrowing, which lowers blood pressure and improves blood flow. Atacand is used to treat hypertension. Drugs.com, http://www.drugs.com/atacand.html.

9

On May 20, 2004, Claimant went to see Dr. Ashaye at Crusader again. (Tr. 219.) Dr. Ashaye reported that "[t]his is the first time during all of her visits that her blood pressure has come down to 110/60 sitting, 110/70 standing. She feels fine . . . [and] [s]he now takes her medications regularly." (Tr. 219.)

On September 9, 2004 Claimant entered SAH after her scheduled mammogram could not be performed because her blood pressure was elevated. (Tr. 233.) Claimant stated that she had not taken her blood pressure medication for the last two months because she could not afford it. (Tr. 233.) Katherine M. Bower, P.A., noted that Claimant "smokes ten cigarettes a day[,] and has done so for 40 years. [Claimant] also drinks a six-pack of beer per day." (Tr. 233.) Claimant was diagnosed with hypertensive urgency and cephalgia. (Tr. 233.) She was ordered upon discharge to go to Crusader immediately to have her medications refilled and to comply with her regimen. (Tr. 233.)

Two weeks later, on September 22, 2004, Claimant saw Dr. Ashaye at Crusader with a cough which produced "yellowish" sputum. (Tr. 218.) Claimant was diagnosed with bronchial asthma, an upper respiratory tract infection, and hypertension. (Tr. 218.) Dr. Ashaye gave Claimant Combivent, amoxicillin, and some Robitussin to help clear the cough. (Tr. 218.)

On November 30, 2004, Claimant underwent pulmonary function testing ("PFT") at Crusader. (Tr. 230.) Claimant's PFT results show that she has a "mild restrictive ventilatory defect." (Tr. 230.) The "Pulmonary Function Report" ("PFR") stated, "this [defect] is indicated by the finding of a mildly reduced forced vital capacity (FVC)." (Tr.

230.) The PFR went on to state that "[t]he finding of a disproportionately reduced forced expiratory flow during the middle half of exhalation (FEF 25-75) suggests the possibility of a superimposed early obstructive pulmonary impairment." (Tr. 230.) The PFT further reported that "Bronchodilator therapy was administered[,] followed by repeat spirometric testing. The FVC, FEV1, and FEF 25-75 all show significant improvement[,] indicating that [Claimant] would most likely benefit from ongoing bronchodilator therapy." (Tr. 230.)

From December 11 to December 20, 2004, Claimant was hospitalized at SAH complaining of chest pain radiating into her left arm. (Tr. 237.) In his final diagnosis, Dr. Edward Telfer, M.D., Cardiology, ruled out the possibility of a heart attack. (Tr. 239.) The final diagnosis of Claimant listed chest pain, hypertension, alcohol and cocaine abuse, coronary artery disease, hypercholesterolemia, and asthma (or chronic obstructive pulmonary disease {"COPD"}). (Tr. 239.) Dr. Mona M. Clor, M.D., stated that Claimant

"[s]mokes three to five cigarettes a day. [Claimant] does . . . crack cocaine regularly. [Claimant] drinks . . . five six-packs a day[,] plus half a pint [of alcohol] daily." (Tr. 240.) She was discharged in stable condition on December 20, 2004. (Tr. 240.)

On February 1, 2005, Claimant came to Crusader stating that she could not afford her medications, and had not taken them in the prior weeks. (Tr. 215.) However, Claimant said that she had a friend who would give her the money to purchase the medications. (Tr. 240.) Dr. Ashaye emphasized the need for Claimant to take her

medications regularly. (Tr. 240.) Four months later, on June 14, 2005, Claimant again returned to Crusader because she had not taken her medications in over two weeks. (Tr. 214.)

On April 12, 2005, Claimant participated in a psychiatric evaluation to determine her SSI and DIB eligibility. (Tr. 248.) The evaluation was performed by Dr. John L. Peggau, Psy.D.. (Tr. 248.) Dr. Peggau reported that Claimant admitted to drinking a six-pack of beer everyday, smoking a pack of cigarettes everyday, and that she smoked crack cocaine a week prior to the evaluation. (Tr. 248.) Claimant asserted that she experienced auditory and visual hallucinations ("little black men in robes") once or twice a week. (Tr. 248.) Dr. Peggau reported that Claimant "did not report depressive symptoms; however, throughout the current assessment, her mood was depressed." (Tr. 250.) He went on to state that Claimant is unable to manage her finances due to her abuse of drugs and alcohol. (Tr. 250.) Dr. Peggau noted that Claimant has been in four drug and alcohol rehab treatment programs, and incarcerated "numerous times" for theft, battery, and domestic violence. (Tr. 248.)

Dr. Peggau stated that Claimant demonstrated the ability to hear, understand, and communicate with conversational voice, and that she was able to "understand, remember, and carry-out simple and semi-complex instructions." (Tr. 250.) He added, "[C]laimant is able to understand, remember, sustain concentration and persist in tasks. [She] is able to interact socially and adapt to work settings. However, she is likely to be an HR problem." (Tr. 250.) Dr. Peggau diagnosed Claimant with alcoholic dependence, cocaine abuse, depressive disorder, and antisocial personality disorder. (Tr. 250.) After the examination,

Claimant was assigned a Global Assessment of Function ("GAF") score of 65[14]. (Tr. 250.)

Shortly thereafter, on April 17, 2005, Claimant underwent a follow-up Social Security psychiatric review by Dr. Lionel M. Hudspeth, Psy.D.. (Tr. 252.) Dr. Hudspeth found that Claimant had "mild" restrictions of activities of daily living, and "mild" difficulties in maintaining social functioning. (Tr. 262.) Claimant was found to have "moderate" difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 262.)

On July, 21, 2005, Claimant was admitted to SAH with chest pain and difficulty breathing. (Tr. 377.) Dr. Lehmann diagnosed Claimant with chest pain and bronchospasms. (Tr. 378.) Claimant was given an Albuterol inhaler and discharged. (Tr. 378.)

On August 2, 2005, Claimant returned to Crusader. (Tr. 213.) Dr. Ashaye reported that Claimant is "presently in [a] drug and alcohol rehab program. [Claimant] says she is doing well. She is off drug[s] and alcohol, [but] currently smokes. She was admitted to [SAH] eight months ago with chest pain and [a] mild cardiac spasm from [c]ocaine use." (Tr. 213.)

On November 9, 2005, Claimant saw Dr. Ashaye at Crusader. (Tr. 297.) Claimant said that she had trouble collecting her medications. (Tr. 297.) According to

---

[14] The GAF scale is a measure from 1 to 100, with a score of 100 representing superior functioning. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000). The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health illness[,]" and does not "include impairment in functioning due to physical (or environmental) limitations." *Id.*

A GAF score of 65 indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." *Id.*

Claimant, her daughter had been helping her pay, but could no longer do so. (Tr. 297.) In light of Claimant's past medical problems, Dr. Ashaye urged her to talk to the pharmacist for help. (Tr. 297.) Claimant asserted that she was already in the drug assistance program, and was only required to make a five-dollar co-pay for her medications. (Tr. 297.)

On December 12, 2005, Claimant was admitted to RMH for shortness of breath. (Tr. 358.) Dr. Dominic Ricciardi, M.D., diagnosed Claimant with hypertensive urgency, bronchitis, reactive airway disease, probable COPD, history of cocaine and alcohol abuse. (Tr. 359.) Dr. Ricciardi prescribed Norvasc[15], Toprol XL, Lisinopril[16], Hydrochlorothiazide, Catapres[17], Levaquin[18], Combivent, and Zocor[19]. (Tr. 357.) He advised Claimant to remain on a low-sodium, low-fat, and low-cholesterol diet, and discussed the importance of complying with her medications, following up at Crusader, and discontinuation of her cocaine use. (Tr. 357.) Claimant was discharged on December 13, 2005. (Tr. 357.)

On December 30, 2005, Claimant returned to Crusader in order to check her blood pressure. (Tr. 296.) Greg Campbell, P.A., attended to Claimant for Dr. Ashaye. (Tr. 296.) He stated Claimant "was supposed to come in on Wednesday[,] but didn't

---

[15] Norvasc (amlodipine) belongs to a group of drugs called calcium channel blockers. Norvasc relaxes (widens) blood vessels and improves blood flow. Norvasc is used to treat hypertension or chest pain and other conditions caused by coronary artery disease. Drugs.com, http://www.drugs.com/norvasc.html.

[16] Lisinopril is in a group of drugs called ACE inhibitors. Lisinopril is used to treat hypertension, congestive heart failure, and to improve survival after a heart attack. Drugs.com, http://www.drugs.com/lisinopril.html.

[17] Catapres lowers blood pressure by decreasing the levels of certain chemicals in your blood. This allows your blood vessels to relax and your heart to beat more slowly and easily. Catapres is used to treat hypertension. Drugs.com, http://www.drugs.com/catapres.html.

[18] Levaquin is in a group of antibiotics called fluoroquinolones (flor-o-KWIN-o-lones). It fights bacteria in the body. Levaquin is used to treat bacterial infections of the skin, sinuses, kidneys, bladder, or prostate. It is also used to treat bacterial infections that cause bronchitis or pneumonia. Drugs.com, http://www.drugs.com/levaquin.html.

[19] Zocor is used to lower cholesterol and triglycerides (types of fat) in the blood. Zocor is also used to lower the risk of stroke, heart attack, and other heart complications in people with diabetes, coronary heart disease, or other risk factors. Drugs.com, http://www.drugs.com/zocor.html

come." (Tr. 296.) However, he reported that Claimant had been taking all of her medications. (Tr. 296.)

On November 7, 2006, Dr. Ashaye reported that Claimant "[s]topped taking her blood pressure [medicine] for six months[,] despite the fact that the medicine [could have been obtained] though the program." (Tr. 292.) He continued: "We have been through this over the last two years, several times. . . I have stressed the importance of taking her medicine and [that] the dangers of not taking it includes [sic] a stroke and heart attack." (Tr. 292.)

Claimant has produced prescription documentation from August 29, 2007 and August 30, 2007. (Tr. 380-385.) The documents show prescriptions for Prednisone[20], Lisinopril, Vicodin, Tylenol with Codeine, Doxcyline Hyclate[21], and Medrol Dosepak[22]. (Tr. 380-385.) All such documentation clearly contains RMH letterhead. (Tr. 380-385.) Any other medical records which might correspond to these dates, or any dates since, have not been produced.

## V.    **Standard of Review**

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo. Binion v. Charter*, 108 F.3d 780, 782 (7th

---

[20] Prednisone is in a class of drugs called corticosteroids. Prednisone prevents the release of substances in the body that cause inflammation. Drugs.com, http://www.drugs.com/prednisone.html.

[21] Doxycycline is a broad-spectrum tetracycline antibiotic used against a wide variety of bacterial infections, including Rocky Mountain spotted fever and other fevers caused by ticks, fleas, and lice; urinary tract infections; trachoma (chronic infections of the eye); and some gonococcal infections in adults. Drugs.com, http://www.drugs.com/pdr/doxycycline-hyclate.html.

[22] Medrol Dosepak (Methylprednisolone) is in a class of drugs called steroids. Methylprednisolone prevents the release of substances in the body that cause inflammation. Drugs.com, http://www.drugs.com/mtm/medrol-dosepak.html.

Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.    Framework of Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors.

VII. <u>Analysis</u>

1. **Claimant Properly Waived Her Right to Legal Counsel.**

A claimant has a statutory right to counsel at an administrative hearing regarding disability benefits. 42 U.S.C. § 406, 20 C.F.R. 404.1700. "If properly informed of [that right], the claimant may waive it." *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994). In order for the waiver to be valid, the ALJ must "explain to the *pro se* claimant: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to [twenty-five] percent of past due benefits and required court approval of the fees." *Id.* (citing *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991)). Claimant argues that these

requirements have not been satisfied and, consequently, her waiver of representation was improper.

Here, the record shows that on December 15, 2005, the ALJ sent a letter to the Claimant that described the hearing process and Claimant's right to representation ("2005 Letter"). (Tr. 91.) Under the bolded section heading entitled "Your Right to Representation," the letter reads: "You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing." (Tr. 91.) This information presented Claimant with a broad understanding of the services a lawyer could provide her, and the manner in which an attorney could aid in the proceeding. Claimant asserts that there is no evidence that she ever read or received the 2005 Letter. However, Claimant does not allege that she actually failed to read or receive it. Therefore, the court finds her argument unavailing and the first *Binion* requirement is satisfied.

The second requirement calls for the ALJ to discuss the possibility of free counsel or a contingency arrangement. *Binion*, 13 F.3d at 245. At the first hearing on December 11, 2007, the ALJ told Claimant that she "may qualify for some free legal assistance through groups such as [PSLC] or Legal Assistance Foundation. Alternatively, . . . [Claimant] could hire a private representative to represent [her] and that person can take no money from [Claimant] up front." (Tr. 58.) The ALJ made it clear that Claimant could receive free counsel, or that she could hire a private lawyer under a contingency plan, in language the Claimant could easily understand. (Tr. 58.) Therefore, the second *Binion* requirement is satisfied.

The third *Binion* requirement gives the ALJ the duty to inform the claimant that

the limitation on attorney fees is twenty-five percent of the awarded past due benefits, and that such fees require court approval before they are paid. *Binion*, 13 F.3d at 245. At the first hearing, the ALJ stated that attorneys "can only take a portion of any back benefits [Claimant] would be due if [she] was successful with [her] claim[.] [A]nd then[,] they may take up to [twenty-five] percent of those back benefits." (Tr. 58.) In the 2005 Letter, the ALJ states "Your representative may not charge or receive any fee unless we approve it." (Tr. 91.) Therefore, the third *Binion* requirement is satisfied.

Additionally, Claimant assured the ALJ that she had taken steps to retain counsel at the time of the first hearing. (Tr. 58.) Claimant said that if she could be given another hearing date, an attorney would agree to represent her. (Tr. 58.) The ALJ postponed the hearing in order for the Claimant to obtain counsel, but warned that if the attorney did

not take her case, Claimant needed to "hurry quickly" and find another representative. (Tr. 59.) Otherwise, the ALJ continued, Claimant would have to proceed representing herself. (Tr. 59.) Claimant then verbally confirmed her understanding. (Tr. 59.)

The record indicates that Claimant understood her right of representation. Claimant made at least two separate attempts to acquire legal representation for the hearings: first, with a private attorney who declined to represent her after the December hearing, and then with Prairie State Legal Clinic just before the March hearing. (Tr. 65.) Although these attempts were ultimately unsuccessful, it is evident that Claimant knew and understood the importance of obtaining an attorney to represent her as she actively sought such representation. Therefore, this court finds that the ALJ substantially complied with all three waiver requirements set forth in *Binion*.

2.      **The ALJ fulfilled her duty and fairly developed the record.**

Generally, when a claimant appears *pro se*, the ALJ has an increased

responsibility to fully and fairly develop the claimant's record:

> While a claimant bears the burden of proving disability, the
> ALJ in a Social Security hearing has a duty to develop a
> full and fair record. This duty is enhanced when a claimant
> appears without counsel; then the ALJ must "'scrupulously
> and conscientiously probe into, inquire of, and explore for
> all the relevant facts.'" Although *pro se* litigants must
> furnish some medical evidence to support their claim, the
> ALJ is required to supplement the record, as necessary, by
> asking detailed questions, ordering additional
> examinations, and contacting treating physicians and
> medical sources to request additional records and
> information.

*Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009) (citation omitted).

During the December hearing, the ALJ notified Claimant that if she had "obtained

other treatment[,] you need to tell Mr. McCarty[23] or you need to obtain those records and

send them to us." (Tr. 59.) "I attempted to get numerous records," the ALJ continued: "I

don't have anything very current. So, if there is any place I'm missing[,] you need to tell

Mr. McCarty that[,] or you need to let . . . my clerk know so we can order it from any

other source. Okay? . . . It's very important. So, you need to get . . . those records to me. .

.. Ok?" (Tr. 60.) Claimant responded, "Okay." (Tr. 60.) Aside from the August 2007

prescription documents, Claimant provided no other records for the ALJ to consider, nor

does the record indicate that Claimant contacted the court in order to provide them.

During the March hearing, the ALJ stated: "I wrote to various other places[,]

including RMH, SAH, and Dr. [Ramchandani] . . .. [N]one of them responded[,] except I

---

[23] "Mr. McCarty" was the attorney who allegedly agreed to take Claimant's case at the time of the
December hearing.

do have the [prescriptions] that you brought from RMH, showing that you were in the ER in August of 2007[,] but not really indicating why." (Tr. 77.) The ALJ proceeded to ask Claimant why she was admitted to the ER in 2007, and if she had been back since. (Tr. 77.) Near the end of Claimant's testimony, the ALJ asked Claimant: "Do you believe we covered everything, or is there anything that you want to tell me about . . .?" Claimant answered, "No, ma'am." (Tr. 86b.)

Claimant now argues that the ALJ did not order all of her medical records, and therefore failed to "scrupulously and conscientiously" investigate all the relevant facts as required in *Nelms*. The most recent medical record that the ALJ obtained dates back to November 2006 from Crusader Clinic - approximately one year and a half before Claimant's hearing. (Tr. 292.). At the March hearing, the ALJ asked Claimant if she had been back to Crusader within that timeframe. (Tr. 74.) Claimant responded that she had been back to see if Crusader would help her fill out some paper work, and that Crusader told her to come back later because her blood pressure was high. (Tr. 75.)

Also at the March hearing, Claimant produced prescription documentation from RMH, dated from August 29, 2007 and August 30, 2007. (Tr. 380-385.) No other records from these dates were produced. The ALJ asked Claimant why she was at RMH on those days. (Tr. 77.) The Claimant responded, ". . . asthma and my blood pressure." (Tr. 77.) The ALJ then asked Claimant if she had been to the ER since 2007. (Tr. 77.) Claimant answered, "Yes, ma'am, I think so. I'm not for sure, but I have been back." (Tr. 77.) The Claimant went on to testify that she had been admitted for her blood pressure and asthma, and that she had "broken out," swelled up, and could not breathe. (Tr. 77.)

Generally speaking, the record indicates that Claimant has very few medical

records from the year 2007. In March 2008, when seeking representation, Claimant told

PSLC that she had not been treated by a doctor for a year or more, and before that time,

she had only been treated "sporadically." (Tr. 21.) This statement conflicts with

Claimant's testimony at the March hearing.

> "A significant omission is usually required before this court
> will find that the [Commissioner] failed to assist *pro se*
> claimants in developing the record fully and fairly." . . .
> [A]n omission is significant only if it is prejudicial. "Mere
> conjecture or speculation that additional evidence might
> have been obtained in the case is insufficient to warrant a
> remand." Instead a claimant must set forth specific,
> relevant facts-such as medical evidence-that the ALJ did
> not consider.

*Nelms,* 553 F.3d at 1098 (citation omitted).

As reviewed above, when asked about her recent medical history at the March

hearing, Claimant testified that she only returned to Crusader in 2007 to complete some

paperwork, that she was given medication prescriptions from RMH in August 2007, and

was admitted to the ER at some time between 2007 and 2008 because she swelled up and

could not breathe. (Tr. 77.) In her complaint, Claimant has not set forth any other

specific, relevant facts or evidence that the ALJ failed to consider at the hearing.

Therefore, there is no evidence or indication that a significant omission has occurred.

Claimant's allegations of prejudicial and significant omissions by the ALJ may be

properly categorized as mere conjecture and speculation, and therefore, are insufficient.

Additionally, Claimant argues that because Claimant's 2004 pulmonary function

test score "almost met" the Listing requirement, the ALJ failed to fully and fairly develop

the record. Claimant asserts that the ALJ was required to order a consultative evaluation

with a new pulmonary function test to determine whether Claimant's condition had worsened by the time of the hearing. This court does not agree.

Under 20 C.F.R. § 416.919(b), the ALJ is required to order a consultative evaluation when "[t]here is an indication of a change in [Claimant's] condition that is likely to affect [Claimant's] ability to work."

Claimant's only reported pulmonary function test was performed on November 30, 2004 - nearly three and a half years before the date of the hearing. (Tr. 230.) Claimant's FEV1 score before bronchodilator therapy was 1.24 (Tr. 230.) Her score after therapy was 1.59. (Tr. 230.) To meet the Listing requirements, based on her height of sixty-two inches, Claimant's score must register at 1.15 or below. (*See* 20 C.F.R. Pt. 404, subpt. P, App. 1, § 3.02, Table No. I). Clearly, neither score meets that requirement.

In fact, the 2004 test's interpretation report is explicit in that Claimant suffers from a "mild restrictive ventilatory defect." (Tr. 230.) The report goes on to state that Claimant's "FVC, FEV1, and FEF 25-75 all show[ed] significant improvement" after bronchodilator therapy, and Claimant would "most likely benefit from ongoing . . . therapy." (Tr. 230.)

In this case, there is no credible indication or convincing evidence, provided by the Claimant, or her medical records, that Claimant's condition actually deteriorated in the time between the date of application and the hearing. Nor is there any evidence brought forward indicating any change in her condition whatsoever. Therefore, this court holds that the ALJ did not err in failing to order a consultative evaluation with a new pulmonary function test, as there was no indication that a new test was necessary. As

such, this court finds that the ALJ fully and fairly developed the record.

**3.    Claimant is not disabled.**

**A.    Step One: Claimant is not currently engaged in substantial gainful activity.**

In the Step One analysis, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If Claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If Claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ found that Claimant has not engaged in substantial gainful activity since June 15, 2004. (Tr. 14.) Neither party disputes this decision. As such, this court affirms the ALJ's Step One determination.

**B.    Step Two: Claimant Suffers From a Severe Impairment.**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe

impairment, then the inquiry moves on to Step Three. If Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant had the following severe impairments: a history of cocaine and alcohol abuse, hypertension, asthma/emphysema, and depression. (Tr. 14.) The substantial evidence in the record supports the conclusion that Claimant suffered these severe impairments. Neither party disputes this decision. As such, this court affirms the ALJ's Step Two determination.

### C. Step Three: Claimant's impairment does not meet or medically equal an impairment in the commissioner's listing of impairments.

At Step Three, Claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. 20 C.F.R. §§ 404.1525(a); 416.925(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that none of Claimant's impairments met or medically equaled the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. Neither party disputes this finding. As such, this court affirms the ALJ's Step Three determination.

### D. Step Four: Claimant is not capable of performing work which Claimant has performed in the past.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his or her limitations. *Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is such work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. §§ 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's RFC allows the claimant to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

Before considering the Step Four analysis, the Commissioner determined Claimant's RFC enabled Claimant "to perform simple, unskilled light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except for no more than occasional stooping, crawling, climbing, crouching, kneeling, or balancing, and no concentrated exposure to

pulmonary irritants." (Tr. 16.)

Although the VE testified that "[C]laimant's past work as an assembler is not precluded by her [RFC,]" the ALJ decided that since "[C]laimant's tenure at this [assembling] job was very limited[,] . . . the analysis will proceed to Step [Five]." (Tr. 18.) Therefore, ALJ determined that Claimant was unable to perform any past relevant work. (Tr. 18.) Neither party disputes this decision. As such, this court affirms the ALJ's Step Four determination.

 

     **E.**       **Step Five: Claimant is capable of performing work existing in substantial numbers in the national economy.**

At Step Five, the Commissioner must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

At the March hearing, the ALJ relied on the testimony of a VE to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the national economy. (Tr. 19.) (*See* 20 C.F.R. Pt. 404, subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28). The VE testified that a person of Claimant's age, education,

work experience, and RFC are able to perform the requirements of such representative occupations as: packer (11,200 jobs in the northern Illinois area), food preparation worker (2,100), and mail clerk (3,700). (Tr. 19.) A total of 17,000 jobs is clearly a significant number. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). In consideration of this testimony, the ALJ found that there are jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. 18.) (*See* 20 C.F.R. 404.1560(c), 404.1566, 416.960(c), and 416.966).

Neither party disputes this finding. As such, this court affirms the ALJ's Step Five determination.


**VIII.   Conclusion**

This court finds that the ALJ properly obtained a waiver of Claimant's right to representation, fully and fairly developed the record, and considered substantial evidence within that record to draw a logical bridge from the evidence to her conclusion that Claimant is not disabled.

In light of the forgoing reasons, the Commissioner's Motion for Summary Judgment is granted, and Claimant's Motion for Summary Judgment is denied.

**ENTER:**

_____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: October 5, 2010**